# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of *(Briefly describe the property to be searched or identify the person by name and address)* 2 digital devices in the custody of the Drug Enforcement Administration in Los Angeles, California, which were seized on July 22, 2020 | Case No. 2:20-mj-3689 |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846 | Conspiracy/Distribution of controlled substances |
| 21 U.S.C. § 843(b) | Use of comm'n facility (further narc. trafficking) |
| 31 U.S.C. § 5332 | Bulk cash smuggling |
| 21 U.S.C. §§ 963, 952 | Conspiracy/Importation of controlled substances |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Jeffrey Kishi*
Applicant's signature

Jeffrey Kishi, FBI Task Force Officer
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

Judge's signature

City and state: Los Angeles, CA

Hon. Alicia G. Rosenberg, U.S. Magistrate Judge
Printed name and title

AUSA: B. Balding (x2274)

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital devices (the "**SUBJECT DEVICES**"), seized on July 22, 2020, and currently maintained in the custody of the Drug Enforcement Administration in Los Angeles, California:

    a.    A white Apple iPhone, Model A1688; FCC ID: BCG-E2946A; IC: 579C- E2946A; unknown Serial Number and IMEI ("**SUBJECT DEVICE 1**"); and

    b.    A black Apple iPhone, unknown model, unknown Serial Number, IMEI, and FCC ID ("**SUBJECT DEVICE 2**").

**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of controlled substances); 21 U.S.C. § 846 (conspiracy to distribute controlled substances); 21 U.S.C. § 843(b) (use of a communication facility to facilitate a narcotics trafficking offense); 31 U.S.C. § 5332 (bulk cash smuggling) and 21 U.S.C. §§ 963, 952 (the importation of controlled substances, and attempt and conspiracy to do so) (the "Subject Offenses"), namely:

   a. Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

   b. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

   c. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written

communications sent to or received from any digital device and which relate to the above-named violations;

  d. Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

  e. Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

  f. Contents of any calendar or date book;

  g. Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

  h. Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

  i. With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

   i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii

          ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

          iii. evidence of the attachment of other devices;

          iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

          v.  evidence of the times the device was used;

          vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

          vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

          viii.  records of or information about Internet Protocol addresses used by the device;

          ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

**II.  SEARCH PROCEDURE FOR THE SUBJECT DEVICES**

    3.  In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

    a.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

    b.  The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

    c.  The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant. The government will not search the digital devices beyond this 120-day period without obtaining an extension of time order from the Court.

    d.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

    i.  The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the

scope of the items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii.  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

    e.  If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

    f.  If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

    g.  If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized,

the government may make and retain copies of such data, and may access such data at any time.

       h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

       i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

       j.   After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

   4.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Jeffrey Kishi, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of an application for a warrant to search two digital devices (a white Apple iPhone ("**SUBJECT DEVICE 1**") and a black Apple iPhone ("**SUBECT DEVICE 2**" and, collectively with **SUBJECT DEVICE 1**, the "**SUBJECT DEVICES**") in the custody of the Drug Enforcement Administration ("DEA"), in Los Angeles, California, as described more fully in Attachment A.

2. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of controlled substances); 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances); 21 U.S.C. § 843(b) (use of a communication facility to facilitate a narcotics trafficking offense); 31 U.S.C. § 5332 (bulk cash smuggling) and 21 U.S.C. §§ 963, 952 (the importation of controlled substances, and attempt and conspiracy to do so) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or

investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. AFFIANT BACKGROUND

4. I am a Task Force Officer ("TFO") of the United States within the meaning of Title 21 and Title 18 United States Code ("U.S.C."). As such, I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 372, monitor Title III intercepts, and to seek and execute arrest and search warrants supporting a Federal Task Force. I am a TFO for the Federal Bureau of Investigation ("FBI"). I am also a Detective with the Los Angeles Police Department ("LAPD") and have been so employed since September 1996.

5. I have received over 100 hours of formal classroom training in the area of dangerous and illegal drugs. This training was provided by the Los Angeles Police Department, Narcotics Division Training Section, DEA, California Department of Justice, Bureau of Narcotic Enforcement, California Narcotics Officers Association and experienced detectives from agencies throughout California. I have also developed contacts with, and spoken to users, sellers, manufactures, informants, and other experts in controlled substances regarding trafficking, their usage and terminology of narcotic substances in the Southern California area. I have participated in excess of 500 controlled substance investigations, and arrests of persons for violations of controlled substance laws. I have purchased controlled substances in an undercover capacity in excess of 100 times.

2

During my career as an officer, I have arrested hundreds of persons for violations of various narcotics laws, and I have spoken with numerous narcotics users and sellers. I have qualified or testified as a narcotics expert in the Los Angeles Superior Court for possession, possession for sales, sales, packaging, use, paraphernalia of cocaine, cocaine base, methamphetamine, GHB, heroin, PCP, and marijuana.

### III. SUMMARY OF PROBABLE CAUSE

6. This affidavit seeks authorization to search the **SUBJECT DEVICES**, which were seized following a traffic stop by the California Highway Patrol ("CHP") in which Liliana Hortencia RUBALCAVA Gonzalez ("L. RUBALCAVA"), who is believed to be a transporter of drug proceeds, led to the arrest of L. RUBALCAVA after the discovery of approximately $418,000, packaged and hidden inside a non-factory compartment in the vehicle L. RUBALCAVA was driving. The **SUBJECT DEVICES** were both located inside L. RUBALCAVA's vehicle.

### IV. STATEMENT OF PROBABLE CAUSE

7. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A. Case Background**

8. In or around March 2020, the Los Angeles Strike Force DEA SWB1/FBI CE-1 ("LASF"), with assistance from the Los Angeles Police Department ("LAPD") and Homeland Security Investigations San Diego ("HSI San Diego"), initiated an investigation into a Drug Trafficking Organization ("DTO") suspected of trafficking

3

narcotics from Mexico to the Los Angeles area. L. RUBALCAVA is suspected of working with Jesus RUIZ Sandoval ("RUIZ"), Anya GARCIA ("GARCIA"), Francisco Javier RUBALCAVA Garcia ("F. RUBALCAVA"), Iris GARCIA (I. GARCIA), and others (the "Target Subjects"), to commit violations of the Target Offenses.

### B. Border Crossings of L. RUBALCAVA

9. On two occasions, L. RUBALCAVA was stopped for a secondary inspection at the San Ysidro Port of Entry ("POE"), entering from Mexico to the United States. On March 4, 2020, L. RUBALCAVA was stopped at the San Ysidro POE entering from Mexico to the United States in a silver Honda Civic with California license plate ("CLP") 6YAG252 (the "HONDA"). A narcotics detecting K-9 alerted to the vehicle; CBP conducted a further inspection and discovered a non-factory compartment that was empty at the time of the search.[1]

### C. Tracking Device on the HONDA

10. On July 1, 2020, the Honorable Gail J. Standish, United States Magistrate Judge for the Central District of California, issued an order in Case No. 20-MJ-3054, authorizing the installation and use of a tracking device for the HONDA.

---

[1] Based on my training and experience, I know narcotics traffickers use non-factory compartments to conceal contraband including narcotics and narcotics proceeds. Further, I know that because narcotics proceeds are often stored in the same locations as narcotics and/or are handled by the same individuals who handle narcotics, it is common for narcotics proceeds to carry the odor of narcotics. Thus, although the non-factory compartment in the HONDA was empty on the search date discussed herein, I believe it was being used to transport narcotics and/or narcotics proceeds on other occasions.

11. On July 22, 2020, location monitoring and surveillance showed the HONDA traveling southbound on the I-5 Freeway from the City of Anaheim. At about 11:20 a.m., law enforcement established surveillance of the HONDA parked in front of 25261 Earhart Road, in the City of Laguna Hills. L. RUBALCAVA was seen driving the HONDA to various locations and eventually traveled southbound on the I-5 Freeway, while under surveillance.

    **D.**    **Arrest of L. RUBALCAVA**

12. On July 22, 2020, at approximately 1:36 p.m., CHP conducted a traffic stop of the HONDA in the City of Chula Vista. A trained narcotics K-9 was deployed to the exterior of the HONDA. The K-9 alerted to the right front passenger door area and also alerted to the rear floorboard of the HONDA. Following the K-9 alerts, officers searched the interior of the HONDA and located approximately $418,130 hidden in a non-factory manufactured compartment in the floorboard of the rear passenger seats. The recovered U.S. currency was packaged in various methods including heat-sealed plastic, rubber bands, and plastic wrap. L. RUBALCAVA denied ownership and knowledge of the concealed U.S. currency located within the HONDA.

    a.    Based on my training and experience, statements by the CHP K-9 handler, the large amount of U.S. currency, the concealment of the U.S. currency in the non-factory compartment, the manner in which the money was packaged, and my understanding that the K-9 is only trained and certified to alert to the odors of marijuana, methamphetamines, cocaine and heroin, I believe

5

that the U.S. currency discovered was likely proceeds from drug trafficking and/or sales.

13. **SUBJECT DEVICE 1** was recovered from inside a small backpack purse on the front passenger seat of the HONDA, and **SUBJECT DEVICE 2** was recovered from the center console of the HONDA. L. RUBALCAVA was alone in the HONDA at the time of her arrest.

E.   **Statements of L. RUBALCAVA**

14. On July 22, 2020, after CHP officers arrested and transported L. RUBALCAVA to the CHP San Diego Area office for further investigation, an interview was attempted in order to determine who owned the money located in the non-factory compartment. The arresting CHP officer admonished L. RUBALCAVA of her Miranda Rights; L. RUBALCAVA declined to speak with investigators. While still in custody, L. RUBALCAVA made an unsolicited inquiry to law enforcement regarding the **SUBJECT DEVICES** that had been seized form the HONDA and asked if she could get a phone number out of one of the phones. Law enforcement asked if she would provide the passcode to unlock the phone in question so that law enforcement could access the phone to give her the requested phone number, but L. RUBALCAVA declined.

15. The screensaver photograph on the iPhone lock screen for **SUBJECT DEVICE 1** contains a photograph of three people. I obtained the California driver's license photo of L. RUBALCAVA taken on January, 1, 2020, and it appears to be one of the three people on that screensaver photograph.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

16. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

    c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or

7

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

      e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

17. As used herein, the term "digital device" includes the **SUBJECT DEVICES**.

18. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary

directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

19. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data in a short period of time for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

20. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//
//
//

10

## VII. CONCLUSION

21.  For all of the reasons described above, there is probable cause that the items to be seized described in Attachment B will be found in a search of the **SUBJECT DEVICES** described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
August, 2020.


_____
HON. ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE